**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 15, 2024**

# In the Court of Appeals of Georgia

A23A1432. PREMIER PETROLEUM, INC. v. HEER, INC. et al.

DOYLE, Presiding Judge.

In this breach of contract action, Premier Petroleum, Inc. ("Premier"), appeals from the trial court's refusal to enforce a contract between it and HEER, Inc., and Ajay Patel (collectively "the defendants") after the court determined that the contract was unconscionable. Premier argues that the trial court erred by (1) finding that the contract was unconscionable, and (2) alternatively, for refusing to enforce the contract as a whole after so finding, rather than striking only specific unconscionable provisions. For the reasons that follow, we affirm.

The record shows that Ajay, who was born in 1958, and his wife, Uma, who was born in 1967, moved to the United States around 1985, first living in New Jersey and

later moving to Douglas, Georgia, in 2000. Ajay had an eleventh grade education, and he did not take any English language courses or obtain formal education after moving to the United States, could not read English, and he only spoke minimal "practical" English. Uma had a sociology degree from India, but she could not read written English. The Patels spoke Gujarati, which is not widely spoken in the United States, but they also understood Hindi, in which many government documents are made available. Additionally, the couple had three daughters, born between 1994 and 1999, whom they occasionally consulted to translate on their behalf. The couple would bring their sister to their attorney's office to help translate for them in the instant litigation.

When the couple moved to Georgia, they leased and operated a convenience store that did not sell gasoline; the couple from whom they leased the company also spoke Gujarati. Around 2004 to 2006, the couples formed HEER, Inc., and they purchased a gas station and convenience store located in Cochran, Georgia. This station was supplied with gasoline by a related company that sold them the station; thereafter, the owner decided to exit the gasoline supply business in 2009, and consequently, the defendants needed to find a new supplier. While reading an Indian-American news publication, Ajay saw an advertisement for Action Fuels, a supplier

located in Gwinnett County. Ajay traveled to Action Fuels's office, but he had not set up a meeting prior to arrival and discovered that the office was closed. Premier's office was located next door and was open, so Ajay visited that company, eventually speaking with Aziz Dhanani, the president of the company, who also spoke Gujarati.

According to Ajay, Dhanani visited his station in Cochran, and the parties negotiated a verbal supply contract in Gujarati between HEER and Premier for a ten-year term during which time the price of the gasoline would be $0.01 over rack price.[1] Ajay had requested a five-year term, but Dhanani refused. As customary when changing gasoline suppliers, Ajay requested that Premier refurbish the store to reflect the new brand (in this case, Chevron to Shell). And in order to account for the money in making these changes to the station, Premier would charge $0.02 over rack price for the first two years and $0.01 for the remainder of the ten-year term.

Ajay could not identify the written contract when it was presented to him during the court hearing, because he could not read English, and he stated that he signed because Dhanani explained that the written contract said what the two had

---

[1] Rack price is the price paid by Premier at the terminal, and it changes daily depending on different factors in the business environment. It is undisputed that this is a generally accepted business practice in the industry.

negotiated verbally. Ajay testified that he was not given a physical copy of the contract before signing, although he was told it would be sent, he was not given a copy after he signed it, and he did not request time to review it before signing because he trusted Dhanani's statements that the contract reflected their negotiated terms. Ajay testified that Dhanani knew he could not read English because they had a good relationship, and Dhanani never asked if he wanted the contract in Gujarati or English.

According to Ajay, the two did not negotiate or discuss a renewal clause for the contract. Nevertheless, the written contract reflected five, ten-year renewal periods, with the first renewal being automatic and the next four being at Premier's discretion for a possible total contract length of sixty years; HEER was given no discretion or ability to end the renewals for any reason. The renewal provision was located on the ninth page of the contract among the general contract provisions, not the same provision as the initial ten-year term, which was on the first page of the contract.[2]

In 2014, the Patels needed a loan and were given $50,000 from Premier, and they signed a restrictive covenant at that time, which Ajay testified was the contract

---

[2] The term provision stated "Term. The term of this Agreement shall run Ten (10) years from the date of hereof. [sic]"

for the loan and a "formality." The restrictive covenant, which was also written in English, was not related to the loan, and it was instead related to the improvements made to the gas station in 2009; the covenant stated that "[t]he Agreements commence on the 23rd day of November, 2009, and expire on the 22nd day of November, 2019 plus renewals as described on page 9 Para: 26 of the contract supply agreement."

In 2019, Ajay testified that they did not receive any calls or inquires from Premier about a making a new contract or about renewal of the old contract, so they negotiated a new contract with D & D Energy Group ("D & D"). Uma testified that she contacted Dhanani about the end of the contract and was told it would be over in February 2020 because it actually ran ten years from the date of the first shipment of gasoline; he did not mention a renewal at that time. For this new contract with D & D, the defendants agreed to purchase a set number of gallons of gasoline over a ten-year time frame, and if they had not purchased that many gallons, the contract would continue until that required number of gallons was reached.

Ajay testified that they wanted to switch suppliers because Premier had been consistently late with deliveries starting about two or three years after signing the contract, had required them to pay for repairs that the defendants did not believe they should have been responsible for, and had overcharged the defendants on the contracted rate for the last eight years of the contract (Ajay believed they should be paying $0.01 over rack for the last eight years of the contract). When the defendants signed with D & D, they made sure to have an interpreter with them to read the contract, but Ajay also stated that the company explained the written contract to them.

Uma testified that the defendants would not have signed the Premier contract if they had known the renewal provision was added because they were not even sure they would live for 60 years from 2009. She also explained that while she had brought friends or family members to assist with signing other contracts over the years, the Patels did not bring anyone to Premier because Dhanani also spoke Gujarati, so they trusted him.

With regard to the 2014 restrictive covenant, Uma testified that her mother-in-law was seriously ill at the time, and the family needed money quickly, so they went to Dhanani because he had loaned money to her in-laws and to avoid a lengthy process

with the bank. Dhanani told the couple to come to his office with five checks, and he would give them a loan. When they arrived he presented them with documents purported to be for the loan, but later were revealed to include a restrictive covenant related to the 2009 supply agreement, which included a clause that prohibited the sale of gasoline supplied by other companies. Uma testified that Dhanani did not discuss this with them at that time.

Dhanani, the CEO of Premier, had been in the gasoline supplier business for about 22 years at the time of the hearing, spoke Gujarati and English, was aware that the Patels primarily spoke Gujarati, but he provided the written contract only in English. Dhanani testified that the Patels approached him about supplying their station, and on one occasion, he met Ajay's mother, who implored him to "consider him as your Hindu brother and take care of him." Dhanani also testified that he initially proposed $160,000 for refurbishing the canopy and gas pumps at the station because the station's maximum capacity of 35,000 gallons was too small for an adequate return, but he ended up agreeing to increase the amount to $200,000 in exchange for the $0.02 above rack rate rather than $0.01.[3] He also testified that he

_____

[3] Premier ended up spending $225,047.39 to refurbish the station, but this information was not memorialized in the 2009 supply contract. In fact, the contract

would need "four renewals" to get the money back, and he disputed the testimony by the Patels, instead detailing the discussions of the terms of the contract, the changes to the prices, and the reasons for the renewals.

Dhanani stated that Premier had over 200 contracts at the time of the hearing, with terms as short as 10 years with certain gallon requirements up to 75 years with renewals, and each contract was based on different negotiations and needs of the locations. He did not dispute that the contract was in English, but he stated that the Patels were given multiple copies of the contract prior to signing it. When asked about a provision of the contract related to the supplier markup, Dhanani admitted that Premier had the option to change their markup on the delivered gasoline at any time without any upper limit, but he denied that he ever increased the markup from $0.02 over rack. Dhanani also testified that the renewal provision allowed him discretion to renew each ten-year period because with the rise of electric vehicles, he may not want to be in business beyond a certain point in time.

On February 14, 2020, after the defendants signed the contract with D & D, Premier sent a cease and desist letter to the defendants, explaining that they were in

does not include anything related to the initial cost to refurbish.

8

default of the current term of the contract that was set to end in November 2029. In March 2020, Premier sued the defendants for breach of the supply agreement, for breach of a promissory note,[4] and for unjust enrichment, and Premier sought actual and liquidated damages, specific performance, injunctive relief, and attorney fees. The defendants answered, alleging several defenses, including, inter alia, that the contract was unconscionable, and they alleged counterclaims for breach of contract, promissory estoppel, and attorney fees.

The defendants moved to dismiss the complaint on the ground that the contract had not been breached or their performance was excused, and in any event, the contract was ambiguous, unconscionable, or the product of fraud; additionally, they argued that Premier had waived enforcement, was prohibited from enforcing the contract by equitable estoppel, and was barred from raising a claim of unjust enrichment. The parties then filed cross-motions for summary judgment.

After the hearing on the motions for summary judgment, the trial court issued an order denying both motions, finding that genuine issues of material fact existed as to (1) whether Premier's actions excused the defendants from performing; (2) the

_____

[4] Premier dismissed without prejudice the breach of contract claim based on the promissory note.

9

meaning of certain ambiguous contract provisions; (3) whether Premier's statements were material misrepresentations of the contract, and if so, whether the defendants exercised due diligence; (4) promissory estoppel; and (5) damages. The court also found invalid the liquidated damages provision and the waiver of jury trial provision in the contract. Finally, the trial court found evidence that the contract was unconscionable, and it set a second hearing on that issue in order to make a determination on the matter.

At the hearing to address unconscionability, the trial court conducted a voir dire of the Patels to determine whether they required the service of a translator during the proceedings, and the court appointed an interpreter after determining it was warranted. After the hearing at which both the Patels and Dhanani testified, the trial court issued a 22-page order finding in favor the defendants on the basis that the contract was both procedurally and substantively unconscionable. The trial court found that unconscionability permeated the contract, and it declared that the contract was void and unenforceable. The court then dismissed the complaint, but it noted that the defendants' cross-claims (if any remained viable without the contract) could proceed against Premier.

Premier filed an application for interlocutory appeal with this Court after the trial court issued a certificate of immediate review of its last order. This Court thereafter issued an order explaining that the effect of the trial court's order was a grant of summary judgment to the defendants as to Premier's claims and that the order was subject to direct appeal. Premier then timely appealed.

1. As an initial matter, the parties maintain that we should apply the usual summary judgment standard of review to the trial court's determination of unconscionability, and many of this Court's cases apply this standard if they mention the standard of review at all.[5] That said, OCGA § 11-2-302 explicitly states that unconscionability is a legal matter for determination by the trial court, and it allows the parties to present evidence in order to "to aid the court in making the

---

[5] See, e.g., *Layer v. Clipper Petroleum, Inc.*, 319 Ga. App. 410, 411 (735 SE2d 65) (2012) ("Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant . . . of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.") (punctuation omitted), quoting *GEICO Gen. Ins. Co. v. Wright*, 299 Ga. App. 280, 281 (682 SE2d 369) (2009); *Innovative Image, LLC v. Summerville*, 309 Ga. 675 (848 SE2d 75) (2020) (no standard of review enunciated); *Mullis v. Speight Seed Farms, LLC*, 234 Ga. App. 27, 31 (505 SE2d 818) (1998) (applied the standard of review applicable to summary judgment in reversing the trial court and holding that the disclaimer of warranty and limitation of remedies provisions were unconscionable and unenforceable).

determination." To the extent that the trial court made its own determination of witness credibility or necessary factual findings, which we believe it was authorized to do under the Code section, we review those findings and determinations for clear error.[6]

2. Premier argues that the trial court erred by finding that the contract was unconscionable.

Pursuant to OCGA § 11-2-302 (2), "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination." Our case law explains that "[a]n unconscionable contract is one abhorrent to good morals and

---

[6] Cf. *Blau v. Blau*, 368 Ga. App. 701, 702 (890 SE2d 50) (2023) (explaining that when "reviewing a bench trial, we will not set aside a trial court's factual findings unless they are clearly erroneous, and this Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses," but that "when a question of law is at issue, we review the trial court's decision de novo"). See also *Efficiency Lodge, Inc. v. Neason,* 316 Ga. 551, 565 (2) (b) (ii) n.6 (889 SE2d 789) (2023) (observing the appropriate standard of review of mixed questions of law and fact). In its seminal case on unconscionability, *NEC Technologies, Inc. v. Nelson*, 267 Ga. 390 (478 SE2d 769) (1996), the Georgia Supreme Court adopts and explains "the process by which a court reaches the conclusion that a contract provision is unconscionable," but does not explicitly discuss the standard of review of the trial court's final determination of that question. See id. at 391-396 (1)-(3).

conscience where one of the parties takes a fraudulent advantage of another, an agreement that no sane person not acting under a delusion would make and that no honest person would take advantage of."[7] "But an agreement is not unconscionable merely because it appears to favor one party over another or may lead to hardship. Indeed, we have repeatedly emphasized that parties should be entitled to contract on their own terms without the courts saving one side or another from the effects of a bad bargain."[8]

> The Georgia Supreme Court has explained that unconscionability

> is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula[,] generally divided . . . into procedural and substantive elements. Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves. A non-inclusive list of some factors courts have considered in determining whether a contract is procedurally unconscionable includes the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and

---

[7] (Punctuation omitted.) *Mallen v. Mallen*, 280 Ga. 43, 47 (2) (622 SE2d 812) (2005), quoting *William J. Cooney, P.C. v. Rowland*, 240 Ga. App. 703, 704 (524 SE2d 730) (1999).

[8] (Citations, punctuation, and emphasis omitted.) *Smith v. Adventure Air Sports Kennesaw, LLC*, 357 Ga. App. 1, 6 (2) (849 SE2d 738) (2020).

comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice. As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.[9]

(a) *Substantive unconscionablity.*

The trial court found that the contract was substantively unconscionable because the contract (1) "disproportionately allocate[d] risk to HEER," (2) "containe[d] incomprehensible language," (3) "containe[d] terms that [were] contrary to the law," and (4) contained "terms that [were] not commercially reasonable."

(i) *Disproportionate risk allocation.* The trial court noted that although the defendants testified that deliveries from Premier were consistently late after the first two years of the contract, the contract itself provided no recourse for the defendants related to this issue. Moreover, the contract allowed Premier to exit the contract at each ten-year interval without penalty, but it did not give the defendants any such

---

[9] (Citations and punctuation omitted.) *NEC Technologies, Inc.*, 267 Ga. at 391-392 (1).

option. The extensions were optional only for Premier despite Dhanani's testimony that the whole 60 years were necessary for Premier to recoup its expenses in refurbishing the station,[10] and the additional terms created no additional obligations on the part of Premier to update or make further repairs to the station during those extended terms.[11]

Several contract provisions allowed Premier to terminate in the event that any laws or regulations that affect pricing took effect during the contract term, but it did not give this same termination option to the defendants. Premier was also allowed to terminate the agreement upon a default by the defendants, including but not limited to "severe physical or mental disability of [the defendants]" at a hefty penalty of double the remaining contract price.

(ii) *Incomprehensible language.*

The trial court determined that the price term of the contract was incomprehensible as written because it contained both mandatory pricing, mandatory

---

[10] Dhanani's testimony was conflicting as to this point. Initially, he said the additional penny markup to $0.02 was for the increase in refurbishing costs, but he also stated that the 60-year term recouped those expenses.

[11] Notably, Ajay would be 111 years old by the end of the successive renewal terms in the event that Premier exercised each extension.

price fluctuation, and complete discretion for Premier to raise its markup on the price at any time during the contract period. The provision stated that

> Prices for all products purchased by Customer from Supplier shall be Supplier's cost price from its supplier at its supplier's terminal, plus on Demand common carrier freight based on gross gallons, plus Supplier's Markup, as hereinafter defined, plus the present Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products or Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products. *Prices for all products and Supplier's Mark-up shall be subject to change upon Suppliers form of notice from Supplier to Customer or Customer's employees*, Supplier shall retain all Supplier rebates, discounts and incentives.[12]

> 'Supplier's Markup' shall be One Cent ($.02) [sic] per gallon.

As concluded by the trial court, this provision is incomprehensible in that it is so poorly drafted. Additionally, it is extremely one-sided in that it allows Premier to increase the supplier markup without an upper limit — regardless of whether Premier did not or never intended to exercise such an increase.

---

[12] (Emphasis supplied.)

(iii) *Illegal terms*. The trial court found that although "pre-litigation contractual waivers of the right to trial by jury are not enforceable in cases tried under the laws of Georgia,"[13] the contract contained such a waiver in provision 17. It also found illegal the liquidated damages provision in provision 16 because enforcement would result in double the value of the minimum performance anticipated under the contract, or $1,800,000.[14]

(iv) *Commercially unreasonable terms.* In determining whether the Premier contract was commercially unreasonable, the trial court compared it with the contract prepared by D & D. Notably, on the first page of the Premier contract the stated term is ten years *with no modification of the term or discussion of extensions*. It is not until the nearly the last page of the contract (nine pages later) in the twenty-sixth paragraph that the potentially fifty-year renewal is listed: "Renewal. This Agreement shall automatically renew for (5) [sic] ten (10) year periods unless Supplier provides

---

[13] (Punctuation omitted.) *Suntrust Bank v. Bickerstaff*, 349 Ga. App. 794, 799 (1) (824 SE2d 717) (2019).

[14] See *Banderas v. Doman*, 224 Ga. App. 198, 201 (4) (480 SE2d 252) (1997) (explaining that liquidated damages clauses are not per se illegal or unenforceable but they only "are enforceable if the injury caused by the breach of contract is difficult or impossible to estimate, the parties intend to provide for damages, and the sum stipulated is a reasonable pre-estimate of the probable loss").

Customer ninety (90) days prior written notice of Supplier's election not to extend this Agreement." D & D's contract provision regarding the term of the contract contains all the necessary information about any possible extension within the same clause that states the contracted initial term length.[15] Compared to Premier's contract, the price provision was clearly stated in the D & D contract, it allowed modifications of terms in writing, acknowledged the possibility of breach by each party, clearly defined termination events with a reasonable value as a calculation of damages, and it did not contain unenforceable provisions.

(b) *Procedural unconscionability.*

Citing *NEC Technologies, Inc.*,[16] the trial court assessed "the age, education, intelligence, business acumen and experience of the parties, their relative bargaining

---

[15] "Duration. The term of this Contract is for a 10-year supply agreement and shall become effective upon acceptance of the Purchaser and Seller by execution of this agreement. The 10-year supply agreement will be established by the date of the first load of fuel delivered to the Purchaser's location as referenced by the delivery report with attached Bill of Laden or Feb 1st, 2020[,] and shall not expire until 120 months from the date of the first load of fuel delivered or until Feb 28th, 2030, which ever may come last. The Purchaser agrees to purchase 9,600,000 gallons during the contract. If the volume requirement has not been met after the duration of the contract, then the contract will continue until the total volume requirement has been met."

[16] 267 Ga. at 391-392 (1).

power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice," and determined that the contract was procedurally unconscionable.

(i) *Disparity between the parties.* The trial court determined that Premier was at an advantage over the defendants based on Dhanani's experience as a gasoline supplier versus the Patel's inexperience. The court found that the Patels had never entered into such a supply contract prior to that time based on their purchase of the station, which had an existing relationship with a supplier. Moreover, the trial court found that the Patels were at a disadvantage because they did not speak English sufficiently to read the written contract. Although they often enlisted help from family members when they entered into other contracts, Dhanani spoke Gujarati, so the Patels did not feel it necessary to have another person read the contract. The trial court essentially found that Dhanani exploited his cultural and linguistic connection with the Patels to lull them into complacency when signing the contract.

Premier contends that the trial court erred in its determination because the Patels should have had someone fluent in English read the contract. While it is true

that a party has a duty to read a contract,[17] the Georgia Supreme Court has explained that

> [w]here, however, one who [cannot] read is induced to sign an instrument by the misrepresentations of the other party as to its character or contents, he is not bound thereby. He may, ordinarily, rely upon the representation of the other party as to what the instrument is or as to what it contains; and his mere failure to request the other party, or someone else, to read it to him will not generally be such negligence as will make the instrument binding upon him.[18]

---

[17] See *Results Oriented, Inc. v. Crawford*, 245 Ga. App. 432, 438-439 (1) (b) (538 SE2d 73) (2000) ("[A] party to a contract who can read, must read or show a legal excuse for not doing so, and ordinarily if fraud is an excuse, it must be such fraud as would prevent the party from reading the contract. One cannot claim to be defrauded about a matter equally open to the observation of all parties where no special relationship or trust or confidence exists. Further, in the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations, failure to do which will bar an action based on fraud. One not prevented from reading the contract, and having the capacity and opportunity to do so, cannot after signing it claim he was fraudulently induced to sign by promises which contradict the express terms of the contract.") (citations, punctuation, and emphasis omitted).

[18] *Pirkle v. Gurr*, 218 Ga. 424, 426 (128 SE2d 490) (1962) (addressing a fraud claim). See also *Grimsley v. Singletary*, 133 Ga. 56, (65 SE 92) (1909); *Mallard v. Jenkins*, 179 Ga. App. 582, 583 (347 SE2d 339) (1986).

Moreover, the trial court acknowledged that the Patels did not know Dhanani for more than a month and met him only through contract discussions, but it still found that Dhanani exploited his shared connection with the Patels.[19]

(ii) *Conspicuousness and comprehensibility of the contract language.* The trial court found that the most vital contract term was not conspicuous — the section that dealt with the term extensions of the contract was wholly separate from the initial ten-year term provision on the first page of the contract, especially when compared to the arm's length D & D contract. And the trial court determined that the term extensions were not bargained for by the defendants.

(iii) *Oppressiveness and surprise of the terms*. The court also found that the contract was unduly oppressive because based on the intentionally inconspicuous extension provision, the contract completely prevented the defendants from bargaining for any changes over the next 60 years, it allowed Premier unlimited power to increase the Supplier Markup, and it did not allow the defendants any recourse for

---

[19] Indeed, the translator who the court hired to assist the Patels explained that Gujarati is not a widely spoken language here. While the trial court did find that the Patels and Dhanani attended the same temple, the testimony did not support this finding. That said, we do not think this misapprehension by the trial court meaningfully affected its determination.

a breach by Premier. Additionally, as noted previously, the extension provision was separate from the initial term provision, and the trial court found that it was not a bargained for provision.

Premier strenuously argues that the trial court's determination was overly paternalistic and should be reversed.[20] But the court made extensive findings and did not hang its determination on a single part of the contract or process. It assessed the individual provisions as well as the contract as a whole, it compared Premier's terms to those prepared by D & D, and it assessed the witnesses' testimony about the process of making the contract. The material findings of the trial court are supported by the record, and omitting the limited incidental findings that were incorrect from the calculus does not demand reversal of the trial court, nor does our independent review of the evidence and testimony so demand. It is rare that this Court makes an initial finding of or upholds a trial court determination of unconscionability,[21] but in this

---

[20] See *NEC Technologies, Inc.*, 267 Ga. at 396 (4) ("People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain.").

[21] See, e.g., in *Mullis*, 234 Ga. App. at 31 (considering cases from other jurisdictions to determine that a specific provision was unconscionable).

case, based on the foregoing facts and the reasoning, the Premier contract was unconscionable. Accordingly, the trial court did not err by declaring it so.

3. Finally, Premier argues that the trial court erred by refusing to enforce the contract as a whole and finding that it was permeated with unconscionability rather than simply striking the unconscionable provisions. We disagree. After making a determination of unconscionablity, OCGA § 11-2-203 (1) explicitly gives the trial court discretion to refuse to enforce the contract — "the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."[22] Having upheld the underlying determination

_____

[22] See *Jackson v. Sanders*, 299 Ga. 332, 335 (788 SE2d 387) (2016) ("may" is permissive). See also *Premier Pediatric Providers, LLC v. Kennesaw Pediatrics, P.C.*, Case No. S23G0263 (___ Ga. ___) (4) (decided Feb. 20, 2024) (explaining that when the trial court has an option of dismissing an appeal, even if the court abused its discretion in the underlying determination, an appellate court should not order the trial court to dismiss a case, rather, it should remand for reconsideration after correcting the legal error), citing *Jackson, supra*; *State v. Coleman*, 306 Ga. 529, 530 (832 SE2d 389) (2019) (explaining that "[w]hen interpreting a statute, we must give the text its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way.").

of unconscionability, we decline to reverse the trial court's determination as to a discretionary choice between multiple remedies it is given by statute.[23]

*Judgment affirmed. Senior Judge C. Andrew Fuller, concurs. Gobeil, J., concurs specially.*

---

[23] See *Premier Pediatric Providers, LLC*, Case No. S23G0263 (__ Ga. __) (4).

A23A1432. PREMIER PETROLEUM, INC. v. HEER, INC. et al.


GOBEIL, Judge, concurring specially.

I concur with the majority's conclusion that the trial court's grant of summary judgment in favor of the defendants should be affirmed, but my reasons differ and I am not without concerns.

At the outset, we are keenly aware of the respect the law affords to the freedom to contract. As this Court artfully stated long ago:

> It is better that one individual may now and then suffer the tedious or costly burdens of an ill-advised agreement than to upset the sanctity and security of contractual relations as a whole. Our laws are founded on the great general weal, and must be construed in the consciousness of this supreme purpose, notwithstanding the regrettable hardship which may result in occasional individual cases.

*Yaryan Rosin & Turpentine Co. v. Haskins*, 29 Ga. App. 753, 767 (4) (116 SE2d 913) (1923). Put another way, "[i]n general, parties should be entitled to contract on their own terms without the courts saving one side or another from the effects of a bad bargain; they should be permitted to enter into contracts that may actually be unreasonable or which may lead to hardship." *William J. Cooney, P.C. v. Rowland*, 240 Ga. App. 703, 705 (524 SE2d 730) (1999). So in determining unconscionability, we bear in mind that "Georgia law recognizes and protects the freedom of parties to contract." Id.

Here, it is difficult to discern whether the parties simply failed to exercise reasonable diligence to avoid a bad bargain, or whether (and to what extent) substantive and procedural unconscionability exists. Though close, I ultimately defer to the trial court's findings on procedural unconscionability because the question here

largely boils down to witness credibility — and the trial court was best positioned to assess that credibility.

With respect to substantive unconscionability, my reasoning differs. Here, the contract at issue contains an automatic renewal provision, which, in Premier's sole discretion, could lead to a total contract term of 60 years. It also contains a provision permitting Premier to raise its per-gallon markup, with no upper limit on this amount. It is the *combined effect*[1] of these two terms — in conjunction with the elements of procedural unconscionability found surrounding the execution of the contract — that support the unconscionability finding. See *NEC Technologies, Inc. v. Nelson*, 267 Ga. 390, 391 (1) (478 SE2d 769) (1996) (noting that the test for determining unconscionability in a commercial setting is "whether, in light of the general commercial background and commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract") (citation and punctuation omitted). There are additional contract provisions cited by the trial court in support

---

[1] In light of Dhanani's testimony that the lengthy duration of the contract was necessary to recoup the costs Premier incurred in refurbishing and rebranding the gas station, I would not necessarily find the contract unconscionable based solely on this point.

of its unconscionability finding (i.e., HEER's lack of recourse in the event of late deliveries, the liquidated damages provision, and various provisions allowing Premier to terminate the contract under certain circumstances but not providing HEER the corresponding option to terminate). Notably, however, these provisions are not dissimilar to the corresponding provisions of the D & D contract. Hence, I am not convinced that these provisions can serve as a basis for finding substantive unconscionability.

To be clear, were it not for the presence of the automatic renewal and lack of price limits provisions in the contract, together with the irregularities in the process of making the contract, as found by the trial court, I would reverse the trial court's finding of unconscionability. However, given the deference we owe to the trial court's findings pertaining to witness credibility, and based on the totality of the unique circumstances of this case, I am constrained to agree that the trial court's finding of unconscionability should be affirmed.